IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| BRIAN M. LEYS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:22-cv-431 |
| | ) | |
| METAL SERVICES, LLC d/b/a | ) | |
| PHOENIX SERVICES, LLC | ) | TRIAL BY JURY DEMANDED |
| Serve: | ) | |
| CT Corporation System | ) | |
| Registered Agent | ) | |
| 4701 Cox Rd., Suite 285 | ) | |
| Glen Allen, VA 23060 | ) | |
| | ) | |
| And | ) | |
| | ) | |
| LOUIS WIGGINS | ) | |
| Serve: | ) | |
| c/o Metal Services, LLC d/b//a | ) | |
| Phoenix Services, LLC | ) | |
| Petersburg Gerdau Plant | ) | |
| 25805 Hoffheimer Way | ) | |
| Petersburg, VA 23803 | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

COMES NOW Plaintiff, Brian M. Leys, by counsel, and states the following as his

Complaint against Defendants Metal Services, LLC d/b/a Phoenix Services, LLC and Louis

Wiggins:

### PRELIMINARY STATEMENT

1.    Plaintiff Brian M. Leys' ("Mr. Leys" or "Plaintiff") employment was terminated

by Defendants after he required medical treatment for emotional disorders including a series of

hospital admissions, and his application for short term disability benefits, despite Defendants' receipt of notification of his diagnosis, hospitalization and continued medical care.

2.     Plaintiff brings this action against Defendants Louis Wiggins, the site manager who terminated Plaintiff's employment at the Phoenix Services, LLC Petersburg, Virginia steel mill plant, and Defendant Metal Services, LLC d/b/a Phoenix Services, LLC ("Phoenix" or "Defendant"), his employer, for common law employment termination in violation of Virginia public policy protecting against disability-based discharge and for common law intentional infliction of emotional distress.

3.     Plaintiff further brings this action for statutory legal and equitable relief to redress the injuries done to him by his former employer Phoenix for unlawful disability- based discrimination; for retaliation against Plaintiff for his exercise of legally protected medical leave and interference with Plaintiff's attempts to use of further medical leave; and/or retaliation for Plaintiff's attempts to obtain workplace disability benefits provided employees by Phoenix.

4.     Defendants Wiggins' and Phoenix's actions violated several state and federal prohibitions governing the employment relationship, including:

      a.  Defendant Wiggins' individual liability for termination of Plaintiff's employment in violation of Virginia common law prohibitions against termination of an employee's employment in violation of Virginia public policy (disability);

      b.  Defendant Phoenix's liability as employer for termination of Plaintiff's employment, as employer, in violation of Virginia common law prohibitions for termination of employment in violation of public policy (disability);

2

    c.  Defendant Phoenix's liability as employer for termination of Plaintiff's employment in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 *et seq.* as amended by the ADA Amendment Act of 2008 ("ADAAA");

    d.  Defendant Phoenix's successor employer liability for interference with Plaintiff's medical leave rights and retaliation under the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*; and

    e.  Defendant Phoenix's liability as employer and/or plan sponsor for interference with Plaintiff's welfare benefits (disability and health insurance) protected by Section 510 of the Employee Retirement Income Security Act ("ERISA), 29 U.S.C. §§ 1001 *et seq.*

5.    Plaintiff seeks damages and, where appropriate, declaratory, equitable and injunctive relief to address resulting Defendants' common law and statutory violations. Plaintiff brings this action pursuant to Virginia common law as well as pursuant to the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 *et seq.* as amended by the ADA Amendment Act of 2008 ("ADAAA"), Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601 *et seq.* and the Employee Retirement Income Security Act ("ERISA), 29 U.S.C. §§ 1001 *et seq.* for his injuries arising from Defendants' violations thereof.

## JURISDICTION AND VENUE

6.    This Court has direct and supplemental jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 1367 and/or 42 U.S.C § 12117.

7.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as the tortious actions and unlawful employment practices alleged herein were committed in the Eastern District

of Virginia.  Further, Phoenix operates and conducts business in this District in and around City of Petersburg, Virginia.

8.      Mr. Leys has exhausted all required administrative procedures for his ADAAA claims, having timely filed a formal charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC has issued a "Notice of Right to Sue," and this suit has been brought within 90 days of Mr. Leys' receipt of such Notice, consistent with the procedures for bringing this action pursuant to the ADAAA.  No administrative exhaustion is required for the common law claims asserted or for claims brought pursuant to the FMLA or ERISA.

## PARTIES

9.      Leys is a 46-year-old citizen of the United States and a resident of Hopewell, Virginia.  He was continuously employed by Phoenix and its predecessors at the "Petersburg, Virginia Gerdau steel mill" from in or about September 10, 2003, until March 12, 2021.

10.     Defendant Wiggins is the site manager for the Phoenix Services, LLC Gerdau Petersburg steel mill and is alleged to have participated in the Plaintiff's wrongful termination acting in the capacity of supervisor or manager and as the primary actor alleged to have terminated Plaintiff's employment in violation of Virginia public policy.  Defendant Wiggins also is sued for outrageous statements and actions designed to further humiliate Plaintiff and to inflict further emotional distress.

11.     Defendant Metal Services, LLC d/b/a Phoenix Services, LLC is a business headquartered in Radnor, Pennsylvania and/or Kennett Square, Pennsylvania.  Metal Services, LLC d/b/a Phoenix Services, LLC operates steel recycling businesses in several states, including the Petersburg, Virginia site where Plaintiff was employed. Nationally, this defendant does

business as Phoenix Services, LLC.  On information and belief, the company's Virginia operations are under Metal Services, LLC due to another Virginia entity registered with the State Corporation Commission with the name Phoenix Services, LLC.  As such, Metal Services, LLC d/b/a Phoenix Services, LLC was Plaintiff's employer within the meaning of Virginia common law, the ADAAA at 42 U.S.C. § 12111(5); FMLA at 29 U.S.C. § 2611; and/or ERISA, 29 U.S.C. § 1002(5), (16) as employer and/or plan administrator or sponsor. Metal Services, LLC d/b/a Phoenix Service, LLC is responsible for Wiggins' tortious actions in the scope of Wiggins' employment and/or in the further ratification or endorsement of the tortious actions of Defendant Wiggins, its site manager, regarding Plaintiff.

## FACTS

12.    At all times material hereto, Phoenix operated a Petersburg, Virginia steel mill owned by Gerdau Ameristeel US, Inc. ("Gerdau").

13.    For over twenty (20) years Mr. Leys had enjoyed a successful career at the Petersburg steel mill with Phoenix and its predecessors, including Olympic Mill Service and Tube City IMS/TMS.

14.    During Plaintiff's 20+ years of work at this facility he had an exemplary work record operating heavy equipment, including front-end loaders and cranes in a facility that recycled steel and produced steel slag. At all times during his employment at the Gerdau steel mill he met or exceeded all legitimate, objective expectations of his position.

15.    Plaintiff received regular pay increases based on his consistent performance, developing specialized skills, and was promoted from Plant Slag Operator to Utility Operator, Crane Operator and, in 2018, to Lead Person.

16.    At age 45, he still enjoyed another 20 or more years of work at the Petersburg

facility.

17.    Of note, Plaintiff had few absences during his lengthy employment at this work site.

18.    On March 12, 2021, immediately after Plaintiff's discharge from a series of in-patient hospitalizations for psychiatric care, but prior to his physician's authorization to return to work, Plaintiff received a telephone call from Defendant Wiggins, on behalf of Defendant Phoenix.  Mr. Wiggins told Plaintiff that he (Wiggins) had had PTSD and had lost his uncle but he *had gotten over it* and that Plaintiff *just needed "to get over what you're going through"* and *"get yourself together."*  He terminated Plaintiff's employment.  When Plaintiff asked if he could return to work at a later date, he was told by Defendant Wiggins that he could "try" calling him back for work "in maybe 6 months, but no promises." Until then, he told Plaintiff, "*you are fired*."  The effect of this action was to deny Plaintiff pay and benefits at a time when he was most vulnerable and with a conscious or reckless disregard for Plaintiff or his rights.  It had the desired effect.

19.    Defendants Wiggins' actions, individually, and Phoenix Services, LLC's actions, as employer, violate each of the common law and statutory rights on which this claim is brought.

<u>Plaintiff's Medical Condition and Care Known to Defendants</u>

20.    In or about 2019 Plaintiff's mother was diagnosed with brain cancer and he took approved Family and Medical Leave Act (FMLA) leave during his mother's lengthy illness, surgeries, treatment and hospice care before her death.  During this time Plaintiff assisted his sister as their mother's primary care-givers.

21.    Mr. Leys suffered severe emotional difficulties after his mother's death, requiring medical care and short hospitalizations in May 2019, October 2020, January 2021, February

2021 and March 2021, but returned to work after each course of treatment and medical care.

22.    On or about February 2, 2021 Phoenix assumed operation of the Gerdau Petersburg steel mill, and of numerous employees from the prior operator TMS, including that of Mr. Leys.

23.    On information and belief, when Phoenix Services, LLC assumed operations and former Petersburg steel mill TMS employees, it was provided employee information, including medical leave histories.  However, reasonable inquiry by Phoenix Services, LLC's HR Department would also have revealed that TMS provided Plaintiff intermittent FMLA leave beginning in May, 2019.

24.    As such, Plaintiff has a disability, a history of disability and/or was perceived as having a disability.  Plaintiff utilized leave and medical benefits provided by his employers.

25.    Both the TMS and Phoenix HR departments were each aware of, and provided, medical leave for these medically necessitated treatments.  He remained under physician's care with medication to control his illness. Doctors' notes were provided to support each period of his work absences and medical care; however, during certain psychiatric hospitalizations, Plaintiff had no access to telephone communication and relied on his family to update his employers.

<u>Plaintiff's February and March 2021 Hospitalizations</u>

26.    Plaintiff was admitted to the psychiatric ward of Petersburg Hospital February 5-15, 2021 for care of his condition.  During this time, he had no access to a telephone or outside communications, but, his sisters, Kelly Olazabal and Kim Shearon, contacted Phoenix to apprise his employer of his condition, medication adjustment, hospitalization and status.

27.    Ms. Olazabal spoke with and text messaged Plaintiff's TMS supervisor, Shawn

Evans (also employed by Phoenix), to advise him of Plaintiff's condition and treatment.

28.    On February 8, Mr. Evans provided the contact information for Ms. Ford, a Regional HR Manager in Phoenix's Radnor, Pennsylvania headquarters.

29.    After Plaintiff's early February 2021 hospitalization, his physician provided Plaintiff permission to return to work, but he relapsed and was re-admitted to the hospital from February 21 - March 9, 2021.

30.    Plaintiff's sisters stayed in regular contact with Phoenix via Mr. Evans and Ms. Ford, who were notified of Plaintiff's February 5-15 and February 21-March 9 hospitalizations and were updated regularly.

31.    Plaintiff sister Kelly spoke with (or left messages) and/or text-messaged with Mr. Evans on February 5, 8, 10, 11, 28, March 9, 10 and 11, updating Phoenix on Plaintiff's condition and ongoing treatment/hospitalizations.  As such, during his hospitalizations, Plaintiff, through his sisters, provided Phoenix medical information regarding his disability status.

32.    On February 28, 2021 Mr. Evans advised Plaintiff's sister Kelly that he had passed the information regarding Plaintiff's hospitalization to the Phoenix site manager, Louis Wiggins and to Phoenix's HR department, who would assist with processing disability payments.

33.    In their February 28 communications, Plaintiff's sister Kelly spoke in depth with Mr. Evans about Plaintiff's situation and concern over limiting the details of his psychiatric treatment in conversations with his co-workers.

34.    On March 10, 2021 Plaintiff's sister Kim Shearon spoke to Ms. Ellen Ford, the Phoenix HR department Regional Manager, to keep her updated on Plaintiff's condition, status and to discuss the availability of short term disability payments.  Ms. Ford advised regarding the

forms and that she was initiating the application process, on Plaintiff's behalf, for short term disability benefits in accordance with Phoenix's group insurance disability coverage through Mutual of Omaha.

35.    Ms. Ford, Phoenix's HR contact, advised Plaintiff's sister that, upon receipt of the medical paperwork, the disability claim would be processed.

36.    Plaintiff was released from the hospital on March 9, 2021 but not to immediately return to work, which was authorized for March 16.

37.    Plaintiff followed up with Ms. Ford in Phoenix HR on March 11 and discussed his short-term disability application with her. He advised her of his medical status and the medical documentation he was collecting to support the disability application. She told him she would assist him in working this out.  His understanding was that there was no issue with his disability benefits application.

38.    A medical release for return to work signed by Mr. Leys' physician on March 10, 2021 permitted Mr. Leys to return to work on March 16, 2021 (subject to continued medical appointments).  Plaintiff's application for Short Term Disability benefits was sent by facsimile to Ms. Ford at her Phoenix Services HR facsimile number at 7:49 a.m. on the morning of March 12, 2021.

<u>Despite His Medically Required Leave and Medical Condition,
Plaintiff's Employment is Terminated</u>

39.    On the evening of Friday, March 12, 2021, Plaintiff received a telephone call from Louis Wiggins, the Phoenix site manager.  Mr. Wiggins advised Plaintiff that he was being terminated for "job abandonment."

40.    Plaintiff opposed his termination explaining that his work absence was due to his hospitalization and medical condition. He explained that he was still under medical care and had

not been released for work.  He also explained that he had just spoken to Ms. Ford in HR the day before about his short-term disability benefits and she said that she was taking care of processing that application.

41.    Mr. Wiggins stated that there were "too many holes" in Plaintiff's medical records and that his disability claim "had been denied."

42.    Mr. Leys explained that his sisters had kept Ms. Ford and Shawn Evans to update Phoenix during his hospitalizations. Mr. Wiggins said that "Shawn is not the site manager, I am, you should have called me."  Plaintiff explained that he was in the hospital without any ability to call out, and his sisters did not have Mr. Wiggins' number, but had spoken with Mrs. Ford and Shawn, Mr. Wiggins said that Plaintiff "should have the (his) numbers from orientation."

43.    Plaintiff advised Mr. Wiggins that he and his sisters had given Phoenix HR everything that the doctor had provided and that, through and after his most recent release from the hospital, he (Plaintiff) was still under doctor's care.

44.    Aware of Plaintiff's fragile emotional status and continued medical care, Mr. Wiggins told Plaintiff that he (Wiggins) had had PTSD and had lost his uncle but he had gotten over it and that Plaintiff *just needed "to get over what you're going through"* and *"get yourself together."*  But Mr. Wiggins clearly communicated to Plaintiff that, because of what he was "going through" he no longer had a job or job related benefits at Phoenix Services.

45.    Plaintiff asked about whether he would be able to obtain unemployment benefits and if he could return to work at Phoenix at his present pay rate.  Mr. Wiggins provided Plaintiff no assurances on unemployment or any future work.  He told Plaintiff he could try calling him back for work "*in maybe 6 months, but no promises*." Until then, he told Plaintiff, "*you are fired*."

46.     As such, Defendant Wiggins' action terminating Plaintiff's employment, and that of Phoenix, was directly related to Plaintiff's medical condition, his disability and his history of medical care, his related status requiring continued medical care and/or his application for disability insurance benefits.

47.     Given the context and circumstances of Plaintiff's discharge from a psychiatric hospitalization days before, and while under continued doctors' care, Defendant Wiggins' conduct was outrageous or intolerable, and recklessly or intentionally designed to cause Plaintiff further distress.

48.     The resulting exacerbated emotional distress suffered by Plaintiff in his vulnerable state, but now facing the loss his financial and medical safety net, was severe, resulting in emotional damages well beyond those which Plaintiff had been treated and from which he was attempting to recover.

49.     Plaintiff's medical care providers have diagnosed severe anxiety and extreme depression suffered by Plaintiff which are proximately related to the circumstances of Plaintiff's discharge, described above, as a "major emotional setback" requiring additional mental health treatment.

<u>Plaintiff Has Been Damaged By Defendants' Actions</u>

50.     Plaintiff was a hard worker and conscientious in his work production. He had performed to his employer's expectations, received regular pay increases and, in 2018, had been promoted to a Team Leader.  At the time of his Phoenix employment, he worked operating specialized crane equipment.

51.     At age 45, Plaintiff was mid-way through his work life.  He had with another 20 or more years of expected work life, representing a present value loss of income and associated

benefits well in excess of $1,000,000.

52.    Plaintiff has suffered financially and emotionally by Wiggins' and by Phoenix's actions, including the loss of his employment, employment-related benefits and severe exacerbated emotional distress:

a.    Plaintiff's salary and medical benefits were terminated;

b.    Plaintiff's health insurance benefits were terminated and, without pay, he was unable afford alternative private medical insurance in the market;

c.    Plaintiff was denied short term disability payments he was qualified to receive;

d.    Although Plaintiff paid for short term disability insurance as a payroll deduction, Plaintiff received no disability insurance from Phoenix or its group provider, Mutual of Omaha Insurance Company on his application for benefits;

e.    Despite numerous applications after his termination from Phoenix, he was unable to obtain work;

f.    As a result of Defendants' actions, after over 20 years of gainful employment at this work site, Plaintiff was unable to provide for his family;

g.    Defendants' actions further exacerbated and damaged his, and his physicians', anticipated ability for Plaintiff to return to work and gainful employment.  The emotional injury resulting from Plaintiff's termination and the loss of all associated benefits was emotionally and finically devastating to him and ultimately resulted in a relapse resulting in his ability to work in the work done for 20+ years in this position. He continues under medical

care.

53.    This collection of events furthered Plaintiff's emotional collapse.  As a result of Defendants' actions, his condition further declined such that has been rendered medically unable to secure employment.

54.    Plaintiff was discriminated against and/or retaliated against by Phoenix for his disability, perceived disability and/or his opposition to disability based discriminatory treatment.

55.     Defendant Phoenix interfered with the disability benefits application(s) initiated by his sisters during his hospitalization with the Phoenix HR Department on his behalf and supplemented with his submission of disability application paperwork on the morning of his termination.

56.    Defendant Phoenix's actions further damaged Plaintiff in that he further lost protected welfare (disability) benefits under the Mutual of Omaha disability policy to which Plaintiff was entitled as a welfare benefit which Phoenix provided to employees as part of his employment's benefit package and which disability benefit Plaintiff paid for through regular payroll deductions. On information and belief, although Phoenix HR (Ms. Ford) had informed Plaintiff that his disability benefits application was being processed, Defendants interfered with his application by misrepresenting the facts of his termination and/or failing to submit papers for short term disability benefits.

57.    Moreover, Plaintiff was not offered health care benefit continuation or other separation benefits offered to other separated employees whose employment was terminated.

58.    On information and belief, consistent with Phoenix policy and practice, other employees who were discharged or otherwise separated from employment were provided health care continuation coverage under the COBRA amendments to ERISA.

59.     On further information and belief, Mr. Leys was replaced by an employee without a disability within the meaning of the ADAAA, and/or who had not recently taken FMLA, or other, leave, and/or had not opposed unlawful discrimination.

60.     Defendant Wiggins' actions, as described above, terminating Plaintiff's employment were authorized, ratified and/or endorsed by Defendant Phoenix Services, LLC rendering Phoenix additionally liable for Wiggins' actions.

61.     Moreover, Phoenix has further authorized, endorsed or ratified Wiggins's actions in taking the position that Plaintiff "abandoned" his position by failing to keep Phoenix apprised of his medical status.  No facts support any such "abandonment" of his position.  While incapacitated, Plaintiff's sisters communicated his medical status to Phoenix.

62.     As outlined above, Phoenix's stated reason for Mr. Leys' termination is pretext, as the true reason(s) for his termination was (were) his disability, his history of disability, his perceived disability and/or retaliation by Phoenix for his opposition to the selective treatment based on his assertion of protected rights.

63.      In the alternative, Phoenix's termination of Plaintiff's employment resulted from a desire to interfere with Mr. Leys' continued leave and/or health care benefits as a Phoenix employee, including welfare benefits protected by ERISA.

<u>**COUNT I**</u>
**Common Law Discharge in Violation of Public Policy**
**(Against Defendant Wiggins)**

64.     Plaintiff incorporates by reference and re-alleges the proceeding paragraphs as though fully set forth herein.

65.     Virginia common law provides for a tort claim for wrongful discharge in violation of the public policy underlying Virginia statutes. *See Bowman v. State Bank of*

14

*Keysville, et al,* 229 Va. 534 (1985).

66.    The tort claim recognized in *Bowman* has been expressly held to include claims against an individual decision maker separate from, and in addition to, claims against the employer entity.  *VanBuren v. Grubb*, 284 Va. 584, 593 (2012) (Virginia recognizes tort claim of wrongful discharge in violation of established public policy against an individual who is not the plaintiff's actual employer but who was the actor in violation of public policy and who participated in the wrongful firing, such as in the capacity of supervisor or manager.)

67.    Virginia public policy *underlying* both the Virginians with Disabilities Act (VHRA) and the Virginia Human Rights Act forbids the termination of at-will employees due to disability.  *See Bradick v. Grumman Data Sys. Corp.*, 254 Va. 156 (1997) ("…it is undisputed that both the VHRA and the Virginians with Disabilities Act (VDA), Code §§ 51-5-1 to 51.5-52 contain clear expressions of Virginia's public policy opposing discrimination against disabled persons.")

68.    The Virginians With Disabilities Act, Va. Code § 51.5-1 "Declaration of Policy" states, in pertinent part:

> It is the policy of the Commonwealth to encourage and enable persons with disabilities to participate fully and equally in the social and economic life of the Commonwealth and to engage in remunerative employment…[1]

69.    The tortious wrongful discharge tort remedy provided by Virginia common law is in addition to any corollary protections provided by statute addressing the same set of operative facts.  *See Lockhart v. Commonwealth Educ. Sys. Corp.,* 247 Va. 98, 105 (1994)

---

[1] The General Assembly's 1995 abrogation of the common law public policy claim relying on the Virginia Human Rights Act as a source of public policy, Va. Code § 2.2-3903, was repealed in 2020 in the Virginia Values Act, Va. Code § 2.2-3903 (2020).  No such abrogation of the common law now exists.

(alternative statutory remedy for same conduct does not foreclose common law claim).

70.    Defendant Wiggins terminated Plaintiff's employment on the basis of his disability in violation of the public policy underlying the clearly stated Virginia public policy opposing discrimination against disabled persons.

71.    Plaintiff has been injured as a direct and proximate result of Defendant's wrongful discharge of his employment.  As a direct and proximate result of Defendant Wiggins' unlawful action, Plaintiff has suffered and will continue to suffer injury and damages including mental anguish, loss of reputation, humiliation, embarrassment, inconvenience, loss of income, diminished earning capacity, lost career and business opportunities, consequential damages, and other injury in an amount to be determined by a jury and the Court.

72.    Defendant Wiggins' actions were willful, malicious, outrageous and in conscious or reckless disregard of Plaintiff's rights, entitling Plaintiff to an award of punitive damages at common law.

<u>**COUNT II**</u>
**Common Law Discharge in Violation of Public Policy**
**(Against Defendant Phoenix)**

73.    Plaintiff incorporates by reference and re-alleges the proceeding paragraphs as though fully set forth herein.

74.    The actions by Defendant Phoenix Services, LLC in terminating Plaintiff's employment on the basis of his disability was in violation of the public policy underlying Virginia public policy.

75.    Moreover, Defendant Wiggins' actions terminating Plaintiff's employment were authorized, endorsed and/or ratified by Phoenix Services, LLC.

76.    As indicated by Defendant Wiggins, Phoenix Services, LLC terminated

16

Plaintiff's employment, wages and associated benefits, including health care benefits.

77.     Plaintiff has been injured as a direct and proximate result of Defendant's wrongful discharge of his employment.  As a direct and proximate result of Defendant Phoenix Services, LLC's unlawful action, Plaintiff has suffered and will continue to suffer injury and damages including mental anguish, loss of reputation, humiliation, embarrassment, inconvenience, loss of income, diminished earning capacity, lost career and business opportunities, consequential damages, and other injury in an amount to be determined by a jury and the Court.

78.     Defendant Phoenix Services, LLC's actions were willful, malicious and in conscious or reckless disregard of Plaintiff's rights, entitling Plaintiff to an award of punitive damages at common law.

## COUNT III
### Intentional Infliction of Emotional Distress
### (Against Wiggins and Phoenix)

79.     Plaintiff incorporates by reference and re-alleges the proceeding paragraphs as though fully set forth herein.

80.     Given the circumstances, including Plaintiff's recent discharge from a psychiatric hospital and following a series of treatment for severe emotional difficulties, Defendant Wiggins actions were extreme, outrageous, and intolerable in a civilized community.

81.     Defendant Wiggins' actions with knowledge of Plaintiff's vulnerable emotional state, including counter-acting the statements of Phoenix's HR Department as to the processing Plaintiff's application for company disability benefits, were recklessly made, and/or or intentionally designed, to cause Plaintiff further emotional distress.

82.     The resulting exacerbated emotional distress suffered by Plaintiff in his

vulnerable state, but now facing the loss his financial and medical safety net, was severe, resulting in emotional damages well beyond those which Plaintiff had been treated and was attempting to recover.

83.    Plaintiff has been injured as a direct and proximate result of Defendants' conduct.

84.    While Defendant Wiggins terminated Plaintiff's employment with Phoenix acting on behalf of Plaintiff's employer, Metal Services, LLC d/b/a Phoenix Services, LLC, incident to and facilitated by his Phoenix employment, the nature and manner of Wiggins' actions constituted an intentional tort not within the expected risks of Plaintiff's Phoenix employment.

85.    However, Defendant Metal Services, LLC d/b/a Phoenix Services, LLC authorized, adopted, ratified and/or endorsed Defendant Wiggins' conduct, terminating future employment, wages and medical and/or disability benefits.

86.    As a direct and proximate result of Defendant Wiggins' conduct, acquiesced in and ratified by Phoenix Services, LLC, Plaintiff has suffered and will continue to suffer injury and damages including severe mental anguish, loss of reputation, humiliation, embarrassment, inconvenience, loss of income, diminished earning capacity, lost career and business opportunities, consequential damages, and other injury in an amount to be determined by a jury and the Court.

87.    Defendants' actions were willful, malicious and in conscious or reckless disregard of Plaintiff's rights, entitling Plaintiff to an award of punitive damages at common law against each Defendant.

**COUNT IV**
**Americans With Disabilities Act Amendment Act (ADAAA)**
**Discrimination/Disparate Treatment**
**(Against Phoenix)**

88.    Plaintiff has a disability within the meaning of the Americans Disability Act (ADA), as amended by the Americans with Disabilities Act Amendment Act (ADAAA), known to Phoenix and/or was perceived to have such disability by Phoenix.

89.    Plaintiff provided a medical release to return to work whereby he would be capable and qualified to perform his duties and essential functions as crane operator with or without a reasonable accommodation.

90.    Defendant's actions caused Plaintiff to further relapse and have caused him ongoing damages.

91.    Defendant's actions complained of herein, including its increased scrutiny of Plaintiff's reporting of his disability and the termination of his employment, were taken because of Plaintiff's disability and/or Defendant's perception of Plaintiff's disability in violation of the ADAAA.

92.    As a direct and proximate result of Defendant's unlawful discrimination, Plaintiff has suffered and will continue to suffer injury and damages including loss of income, inconvenience, mental anguish, litigation expenses including attorneys' fees, consequential damages and other injury.

**COUNT V**
**Americans With Disabilities Act Amendment Act (ADAAA)**
**Retaliation**
**(Against Phoenix)**

93.    Plaintiff incorporates by reference and re-alleges the proceeding paragraphs as though fully set forth herein.

94.    Plaintiff engaged in protected activity when he reported to Phoenix that he was being treated for a continued disability, that he was attempting to obtain short term disability pending a return to work and planned to return to work at Phoenix.

95.    Soon after his reporting to Phoenix regarding his disability status and planned return to work, Defendant terminated Plaintiff's employment in retaliation for Plaintiff's protected activity(ies).

96.    As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered and will continue to suffer injury and damages including loss of income, inconvenience, mental anguish, litigation expenses including attorneys' fees, consequential damages and other injury.

### COUNT VI
### FMLA – Retaliation and Interference
### (Against Phoenix)

97.    Plaintiff incorporates by reference and re-alleges the proceeding paragraphs as though fully set forth herein.

98.    On or about February 2, 2021, Defendant Metal Services, LLC d/b/a Phoenix Services, LLC assumed operation of the steel mill at the Petersburg, Virginia Gerdau site where Mr. Leys was employed, and of Mr. Leys' employment.  Phoenix continued the operations formerly performed by TMS International (Tube City IMS/TMS and assumed the employment of numerous former TMS employees such as Plaintiff.

99.    Plaintiff was a covered by the FMLA while employed by TMS in that TMS was a covered employer, engaged in commerce or an industry affecting commerce, employing 50 or more employees for each working day during each of 20 or more calendar workweeks in the year preceding February 2021.

100.    Plaintiff's medical leaves protected by the FMLA pre-dated and post-dated

Phoenix's February 2021 assumption of the plant operations.  At the time(s) of Plaintiff's leaves for medical care in May 2019, October 2020, January 2021, February 2021, he had been employed by TMS for at least 12 months and at least 1250 hours of service in the previous 12-month period(s).  As such, Plaintiff qualified for, and had received, FMLA leave from TMS prior to Phoenix's February 2021 acquisition of the contract to operate the Gerdau plant.

101.    Phoenix is a successor-in-interest to TMS in accordance with 29 C.F.R. § 825.107, including the circumstances regarding substantial continuity of the same business operation, similarity of jobs and working conditions continuity of work force, supervisory personnel, machinery, equipment and production methods.

102.    Plaintiff exercised his right to job protected medical leave due to a serious health condition under the FMLA.

103.    On information and belief, Plaintiff's FMLA leave was known to Ms. Ford in Phoenix Services, LLC's corporate HR Department.

FMLA Retaliation

104.    Phoenix terminated Plaintiff's employment in retaliation for his use of FMLA leave in that the employer's explanation for terminating Plaintiff's employment is a pretext for the true reason for termination, his use of medical leave protected by the FMLA.

FMLA Interference

105.    Phoenix interfered with Plaintiff's employment in violation of his FMLA rights in that the employer discharged him so as to interfere with Plaintiff's continued use of medical leave until approved by his physician for return to work. As such, Plaintiff's use of FMLA leave was causally related to his termination and Phoenix's termination was intended to, and did, interfere with his continued use of FMLA leave.

21

106.    As a direct and proximate result of Defendant's unlawful retaliation and/or interference, Plaintiff has suffered and will continue to suffer injury and damages including loss of income, inconvenience, mental anguish, litigation expenses including attorneys' fees, consequential damages and other injury.

### COUNT VII
### ERISA Section 510 – Interference with Welfare Benefits and/or Retaliation
### (Against Phoenix)

107.    Plaintiff incorporates by reference and re-alleges the proceeding paragraphs as though fully set forth herein.

108.    Phoenix's employee health and disability benefits are "welfare benefits" protected by ERISA.

109.    Plaintiff exercised his right to participate in Phoenix's employee benefit plans, including disability benefits for medically based health care and/or disability.

110.    Phoenix terminated Plaintiff's employment for the purpose of interfering with his future use of the employee benefit healthcare plan, protected welfare benefits, and/or the cost to Phoenix associated therewith. In so doing, Phoenix discriminated against Plaintiff in violation of ERISA Section 510, 29 U.S.C. § 1140.

111.    As a direct and proximate result of Defendant's unlawful interference and discrimination, Plaintiff has suffered and will continue to suffer injury and damages including loss of benefits due under the benefit plan(s), litigation expenses including attorneys' fees, and other losses subject to appropriate equitable relief.

WHEREFORE Plaintiff requests trial by jury on Counts I – VI and judgment against

Defendants as follows:

Defendant Wiggins

      A.     For an award of appropriate compensatory damages against Defendant Wiggins for violations of Count I, Virginia common law discharge in violation of public policy, in an amount of no less than $300,000;

      B.     For an award of appropriate punitive damages against Defendant Wiggins for violations of Count I Virginia common law discharge in violation of public policy in amount of no less than $300,000;

      C.     For an award of appropriate compensatory damages against Defendant Wiggins for violations of Count III, Virginia common law intentional infliction of emotional distress, in an amount of no less than $1,000,000;

      D.     For an award of appropriate punitive damages against Defendant Wiggins for violations of Count III Virginia common law intentional infliction of emotional distress in amount of no less than $500,000;

Defendant Metal Services, LLC d/b/a Phoenix Services, LLC

      E.     For an award of appropriate compensatory damages against Defendant Phoenix for violations of Count II, Virginia common law discharge in violation of public policy, in an amount of no less than $300,000;

      F.     For an award of appropriate punitive damages against Defendant Phoenix for violations of Count II, Virginia common law discharge in violation of common law in amount of no less than $300,000;

23

G.      For an award of appropriate compensatory damages against Defendant Phoenix for violations of Count III, Virginia common law intentional infliction of emotional distress, in an amount of no less than $1,000,000;

H.      For an award of appropriate punitive damages against Defendant Phoenix for violations of Count III, Virginia common law intentional infliction of emotional distress in amount of no less than $500,000;

I.       For an award of appropriate compensatory damages against Defendant Phoenix in amounts of no less than $300,000 for violations of Count IV, the ADAAA;

J.      For an award of appropriate punitive damages against Defendant Phoenix in amounts of no less than $300,000 for violations of Count IV, the ADAAA;

K.      For an award of appropriate compensatory damages against Defendant Phoenix in amounts of no less than $300,000 for violations of Count V, the retaliation provisions of the ADAAA;

L.      For an award of appropriate punitive damages against Defendant Phoenix Services, LLC in amounts of no less than $300,000 for violations of Count V, the retaliation provisions of the ADAAA;

M.      For an award of actual damages, including the present economic value of lost wages and benefits in a liquidated amount against Defendant for violations of Count VI, the interference portion of the FMLA;

N.       For an award of liquidated damages for a willful violation of Count VI, the interference portion of the FMLA;

O.     For an award of actual damages, including the present economic value of lost wages and benefits in a liquidated amount against Defendant for violations of Count VI, the retaliation portion of the FMLA;

P.      For an award of liquidated damages for a willful violation of Count VI, the retaliation portion of the FMLA;

Q.     For reinstatement of benefits and conversion rights, if any, to individual disability plans, pursuant to Count VII, ERISA.

R.     For extracontractual damages, or other appropriate equitable relief, allowable pursuant to Count VII, ERISA.

S.     For other appropriate equitable and injunctive relief under the ADAAA, FMLA and ERISA, including the enjoining and permanent restraining of future violations and direction to Defendant Phoenix to take such affirmative action as is necessary to insure no continuing effects of the past unlawful practices;

T.     For appropriate declaratory relief declaring the acts of Defendant Metal Services, LLC d/b/a Phoenix Services, LLC violative of the ADAAA, FMLA and/or ERISA;

U.     For an award of a separate amount, in addition to the awards against each Defendant, to offset the adverse tax effects of lump sum payments of damages and/or back or front pay to Plaintiff;

V.     For an award of reasonable attorneys' fees and costs, including expert witness fees expended for Counts IV through VII; and

S.     For such other and further relief to which Plaintiff may show he is entitled.

TRIAL BY JURY DEMANDED ON COUNTS I - VI

Respectfully submitted,

BRIAN M. LEYS

By: _/s/_*Harris D. Butler, III*_____
                    Counsel

Harris D. Butler, III (VSB No. 26483)
Paul M. Falabella (VSB No. 81199)
BUTLER CURWOOD, PLC
140 Virginia Street, Suite 302
Richmond, Virginia 23219
Telephone: (804) 648-4848
Facsimile: (804) 237-0413
Email: harris@butlercurwood.com
          paul@butlercurwood.com